500 So.2d 706 (1987)
William (Rocky) SEITZ, Appellant,
v.
ZAC SMITH & COMPANY, INC., Webb Electric Company of Florida, Inc., Noland Company, Horace E. Shumpert and Phillip R. Jones & Associates, Appellees.
No. BK-172.
District Court of Appeal of Florida, First District.
January 6, 1987.
*707 William J. Green of Green, Dees & France, Pensacola, for appellant.
Donald H. Partington and Millard L. Fretland of Clark, Partington, Hart, Larry, Bond & Stackhouse, Pensacola, for appellee/Zac Smith & Co., Inc., and Webb Elec.
Joe J. Harrell of Harrell, Wiltshire, Stone & Swearingen, Pensacola, for appellee/Horace E. Shumpert.
J. Stephen Menton of Huey, Guilday, Kersteiner & Tucker, P.A., Tallahassee, for appellee/Phillip R. Jones & Associates.
William L. Lee, Jr., of Shell, Fleming, Davis & Menge, Pensacola, for appellee/Noland Co.
*708 SMITH, Judge.
In this action for personal injuries suffered when he fell from a floodlight tower, Seitz appeals the final summary judgment in favor of appellees rendered by the trial court in reliance upon the doctrine of Slavin v. Kay, 108 So.2d 462 (Fla. 1958). We affirm.
In approximately August 1978, the Escambia County School Board contracted with Zac Smith & Company, Inc. (Zac Smith) to do certain construction work at Pine Forest High School and other schools. The contract called for Zac Smith to provide all labor, materials and equipment needed to perform the work which included the erection of numerous floodlight towers at the high school stadium. At the same time, the school board retained Horace E. Shumpert (Shumpert) to provide professional engineering services including the final inspection of the project to assure that the work was done according to the plans and specifications of the project. Webb Electric Company of Florida, Inc. (Webb Electric) subcontracted with Zac Smith to provide assistance in the erection of the floodlight towers. Noland Company (Noland) supplied the floodlight towers for the project. Phillip R. Jones & Associates, Inc. (Jones) orally subcontracted with Shumpert to provide the electrical and mechanical drawings and specifications for the floodlight towers, including the responsibility for the final inspection of the construction after completion. Seitz does not allege that any of these parties was the manufacturer of the poles.
At oral argument, counsel explained that the towers were partially fabricated by the manufacturer and then brought to the site in sections for final assembly. The sections were not all identical, but were numbered sequentially so as to assure that the proper sections were used for each tower. However, in assembling the tower in question, a section intended for another tower was inadvertently used.
The tower is designed to be climbed by means of metal pegs which protrude from the tower at staggered intervals left and right. Because the tower was not assembled sequentially, there was a missing peg where mismatched sections of the tower had been improperly joined together. Seitz's counsel admitted at oral argument that had the tower been assembled sequentially as designed, there would have been no defect. All of the parties agree that the defect (the missing peg) was obvious and discoverable upon reasonable inspection.
The construction project was subsequently completed and accepted by the school board. On May 30, 1983, Seitz, an electrician's helper for the school board, was instructed by his supervisor to climb the tower for the purpose of making a temporary repair to some electric wires located at the top of the tower. On his way up the tower, Seitz encountered a missing peg and informed his coworkers of this.[1] He was told by the senior electrician on the job that if he didn't go ahead and climb the tower he would "get his walking papers." Seitz appreciated the risk of continuing to climb with the peg missing, but he continued his climb nevertheless because he didn't want to lose his job. He was able to proceed to the top of the tower and complete his task. On the way down, he lost his footing and balance when he stepped into the area of the missing peg and fell to the ground suffering severe injuries.
Seitz filed a complaint against the appellees seeking damages on the theories of negligence, breach of warranty and "product liability." All of the appellees moved for summary judgment on two separate grounds: (1) that the chain of proximate causation stemming from any defect in the work was broken as of the date the school board accepted the work since the defect was patent and discoverable on the date of the acceptance which was prior to the injury, and (2) that Seitz's claim was barred by the doctrine of express assumption of risk. *709 The trial court entered a summary judgment but did not specify whether it was based on the first or second ground, or both.
On appeal, no serious contention has been made by Seitz that the tower, which was affixed to real estate, constituted a "product" or "good"[2] which was sold in the marketplace so that principles of strict liability or implied warranty apply. See Chadbourne v. Vaughn, 491 So.2d 551 (Fla. 1986) (public road is not a product for purposes of application of strict liability); Craft v. Wet'n Wild, Inc., 489 So.2d 1221 (Fla. 5th DCA 1986) (defect in water slide amusement attraction manufactured on site by owner did not give rise to cause of action in strict liability); Jackson v. L.A.W. Contracting Corp., 481 So.2d 1290 (Fla. 5th DCA 1986) (contract to repair, seal, coat and restrip private roadway was not a transaction in good within the meaning of section 672.314 despite the use of a sealer in resurfacing, and the defect in resurfacing was not actionable as a breach of implied warranty of merchantability for goods sold by a merchant); Port Sewall Harbor and Tennis Club Owners Association, Inc. v. First Federal Savings and Loan Association of Martin County, 463 So.2d 530 (Fla. 5th DCA 1985) (purchasers of residential real estate had no cause of action for violation of implied warranties where defective work complained of involved roads and drainages in subdivision and did not pertain to construction of homes or other improvements immediately supporting residences); Neumann v. Davis Water and Waste, Inc., 433 So.2d 559 (Fla. 2d DCA 1983), pet. for rev. den., 441 So.2d 632 (Fla. 1983) (principles of strict liability do not apply to structural improvements to real property); and Conklin v. Hurley, 428 So.2d 654 (Fla. 1983) (purchasers not entitled to recover against developer on theory of implied warranty of fitness covering collapsed seawall abutting their lots).
Instead, Seitz's appeal focuses on his right to recover against appellees for the negligent construction of the tower.
As stated in Slavin, 108 So.2d 465, the traditional rule is that contractors are not liable for injuries to third parties occurring after the contractor has completed the work and turned the project over to the owner or employer and it has been accepted by him. The reasons for this rule are that the contractor could have no "present duty" to the third party if the premises were in the possession and control of the owner at the time of the injury, and that it is the intervening negligence of the owner in failing to correct the dangerous condition that proximately causes the injury. The rationale is that:
By occupying and resuming possession of the work, the owner deprives the contractor of all opportunity to rectify his wrong. Before accepting the work as being in full compliance with the terms of the contract, he is presumed to have made a reasonably careful inspection thereof, and to know of its defects, and if he takes it in the defective condition, he accepts the defects and the negligence that caused them as his own, and thereafter stands forth as their author. When he accepts work that is in a dangerous condition, the immediate duty devolves upon him to make it safe, and if he fails to perform this duty, and a third person is injured, it is his negligence that is the proximate cause of the injury. His liability may be incurred either from his substitution for the contractor or from his neglect to repair. Slavin, 108 So.2d at 466, quoting Annot., 13 A.L.R.2d, pp. 207-8. [This annotation has been superceded, see Annot., 58 A.L.R.2d 865 (1958), discussing the negligence of a building or construction contractor as a ground of liability upon his part for injury or damage to a third person occurring after completion and acceptance of the work.]
*710 The rule is subject to exceptions too numerous to fully explicate here. Notably, it does not apply where there is in fact no acceptance, Carter v. Livesay Window Co., 73 So.2d 411 (Fla. 1954); nor does it apply where the dangerous condition is one which is not discoverable by inspection. Slavin, 108 So.2d at 466. There is a further exception to the rule of nonliability where the plaintiff's injuries are caused by an inherently dangerous commodity or inherently dangerous condition created by the contractor before relinquishing control. 2 Fla. Jur.2d, Agency and Employment, § 118; and 38 Fla.Jur.2d, Negligence, § 18. Seitz urges the applicability of this latter exception to the facts here presented. Appellant has cited no case law or other authorities indicating that this floodlight tower would qualify under this exception, and our independent search has produced none.
In products liability cases, courts have applied the concept of inherently dangerous instrumentality or commodity to explosives, firearms,[3] electricity,[4] natural gas, drugs, highly toxic materials,[5] and cranes or construction hoists.[6] See 41 Fla.Jur.2d, Products Liability, § 1. From all that we can determine, something which is inherently dangerous must be so imminently dangerous in kind as to imperil the life or limb of any person who uses it, or as stated in Tampa Drug Company v. Wait, n. 4, "a commodity burdened with a latent danger which derives from the very nature of the article itself." "Inherently dangerous" has also been said to mean a type of danger inhering in an instrumentality or condition itself at all times, requiring special precautions to be taken to prevent injury, and not a danger arising from mere casual or collateral negligence of others under particular circumstances. See 13 Am.Jur.2d, Building and Construction Contracts, § 139, n. 11, Watts v. Bacon & Van Buskirk Glass Co., 20 Ill. App.2d 164, 155 N.E.2d 333 (a glass door is not inherently dangerous).
While the phrase "dangerous instrumentality" and "inherently dangerous instrumentality" have often been used interchangeably, it should be remembered that they do not mean the same thing. While an automobile has long been held to be a dangerous instrumentality, it is not inherently dangerous in and of itself, rather it is dangerous only in its use and operation. See Chrysler Corporation v. Wolmer, 499 So.2d 823 (Fla. 1986), n. 1, citing Lollie v. General Motors Corp., 407 So.2d 613 (Fla. 1st DCA 1981), rev. den., 413 So.2d 876 (Fla. 1982).
The inherently dangerous commodity or condition exception often includes not only things imminently dangerous in kind, but also things not imminently dangerous in kind but rendered dangerous by defect. 13 Am.Jur.2d, Building and Construction Contracts, § 139. However, in the latter instance, the rule of non-liability still applies under Florida case law if the defect is patent and accepted by the owner. See Slavin, 108 So.2d at 466.
This distinction perhaps explains confusing language in Carter v. Livesay Window Co., 73 So.2d 411 (Fla. 1954). Carter involved a subcontractor who delivered precast concrete window frames to a construction job and placed them in the wall of the building when no workmen were on the job or would be for a period of forty-eight hours, and the job was in a residential neighborhood where children would play around the construction work. The window *711 frames, weighing 325 pounds, were not braced or mortared, and the window fell on a child, killing him. The court recited that the test would be whether a reasonably prudent person should have anticipated the presence of the children or other persons at the place where the subcontractor created a condition that a jury could find was an inherently dangerous condition, or a dangerous instrumentality like an explosive substance, an inflammable material, a live wire, or a spring gun.
However, a few years later in Slavin, the Florida Supreme Court explained the language in Carter, noting that while the Carter decision may have been decided as an application of the so-called dangerous instrumentality exception to the rule of non-liability of contractors to third parties, it could not logically be so limited. The court went on to reaffirm the rule of non-liability where the defect resulting in a dangerous condition is patent and is accepted by the owner, distinguishing Carter on the grounds that there was in fact no acceptance in that case and therefore the rule did not apply. Slavin, 108 So.2d at 466.
We conclude after a thorough review of the cases cited that the floodlight tower was not an inherently dangerous instrumentality nor did the contractor leave the construction in an inherently dangerous condition. The tower itself was not inherently dangerous in kind, but instead it was the defect (the missing peg) which made the tower dangerous. This defect was open and obvious and accepted by the owner and it was the school board's failure to make the pole safe that was the proximate cause of Seitz's injury. Slavin, 108 So.2d at 466.
We note that the rule set forth in Slavin is the minority rule and that the majority of jurisdictions hold the contractor liable for foreseeable harm caused by his negligence, not only when he fails to disclose dangerous conditions known to him, but also when the work is negligently done. Prosser and Keeton on The Law of Torts, 723 (W. Keeton, 5th ed. 1984). Nevertheless, the Slavin rule, although severely criticized by some, has been recently reaffirmed as the law in Florida. Chadbourne v. Vaughn, 491 So.2d at 554.
Because we affirm the summary judgment on the basis of Slavin, we do not reach the further issue of whether Seitz's action was barred by the doctrine of express assumption of risk.
AFFIRMED.
WENTWORTH and BARFIELD, JJ., concur.
NOTES
[1] Consistent with the representations of counsel at oral argument, Seitz testified that the pole was smooth, and there was no indention to indicate that a peg had been attached but had broken off.
[2] Section 672.314, Florida Statutes (1981) provides an implied warranty of merchantability for goods sold by a merchant in kind.
[3] Walker v. National Gun Traders, Inc., 116 So.2d 792 (Fla. 3d DCA 1960) (the distributor of an inherently dangerous product such as a second-hand revolver has a duty to members of the public who may be injured by the ordinary use of the product).
[4] Breeding's Dania Drug Co. v. Runyan, 147 Fla. 123, 2 So.2d 376 (1941).
[5] Tampa Drug Co. v. Wait, 103 So.2d 603 (Fla. 1958) (carbontetrachloride was inherently burdened with a potential danger so that distributor had duty to warn of its dangerous potentialities  an inherently dangerous commodity is one burdened with latent danger which derives from the very nature of the article itself).
[6] Lewis v. Sims Crane Service, Inc., 498 So.2d 573 (Fla. 3d DCA 1986).